Okay, we have four argued cases this morning. The first of these is No. 22-1194, H. Lundbeck v. Lupin Ltd., Ms. Barkata, I guess. Am I pronouncing that right? Barkata? Barkata. Barkata. Okay. Good morning, Your Honors, and may it please the Court. Brianne Barkata on behalf of Lundbeck and Takeda. The District Court here erred in finding that the defendants were not liable for infringing plaintiffs' method of treatment patents. The District Court's conclusions on non-infringement cannot be reconciled with its own fact-finding regarding defendants and their products, their approved uses, and their labeling. The record in this case firmly establishes defendants' infringement on three different grounds. First, defendants infringe as a matter of law under Section 271e2a. Second, defendants infringe because even though they were permitted to omit some information from their labels about treatment emergent sexual dysfunction, their labels still contain extensive and detailed information and data that would encourage the claimed uses. And the information must be in the label because it's considered critical and essential to the safety and the effective use of the drug. And third, defendants are liable for contributory infringement, and the Court's conclusion to the contrary was based on legal error. So defendants infringe under Section 271e2a because the District Court correctly found... ...couldn't have gotten approval without the label that they had, right? Your Honor, I believe this Court's case law establishes firmly that inducement can and should be found in that instance. For example, in the AstraZeneca v. Apotex case from 2010, there was a specific instance where the defendant, Apotex in that case, was required to include information that told physicians to titrate down to the lowest effective dose for each patient, and even though that was required by FDA for inclusion, this Court said that that can still be the basis for infringement. And very often, when we are talking about drug labels, the information is in there exactly because it is required for physicians to understand the safe and effective use of a given product. And that can still, of course, if that leads to physicians to prescribe the drug for the claimed use, that is inducement under this Court's case law. And here, the District Court correctly found also that defendants and their products will be approved for the uses that are claimed in the 096 and 910 patents, and that physicians will prescribe defendants and their products for those uses. Now, based on the text and structure of the Hatch-Waxman statute itself, that alone is sufficient to find infringement here. The statute is clear that... Why didn't you list the... Maybe you did, but my understanding is you didn't list the 096 and the 910 patent in the Orange Book until after you had modified the label to include this carved-out data. So, why did you do that? The record actually doesn't contain evidence about the reason for the timing of the listing. However, I don't think that actually affects the analysis here because, really, the question... for this patent in the Orange Book. And the ultimate question of whether or not the information in a label will induce infringement or encourage the prescribed use is determined by the Court's assessment. I think FDA and listing requirements do not determine, ultimately, the infringement of a patent. And here, the District Court correctly found that the drug will be used in this way by physicians. And so the question is, what does the label say? What will the physicians be encouraged to do based on the contents of the label? I think that's the key question. The timing of the listing is really not relevant to that particular question. So, what could they have done to avoid inducement, in your view, and to secure approval for the marketing of a drug which wasn't covered by the patent? What could they do? There may have been... There could, in theory, have been attempts to negotiate with FDA for a narrower indication, for narrowing label language that perhaps was different from what ultimately got included in the label. What would it say? How would it be different? There could have been a narrowing for, for example, first-line treatment, treatment-naive patients with MDD, for example, which would have eliminated treatment of patients who have previously received an SSRI, SNRI, or a tricyclic antidepressant, and then are switched due to sexually-related adverse events. For example, that would have been one way. As the District Court found, the defendants here made no attempt to narrow the indication or narrow the approval that they were seeking. And the ultimate approval that they are seeking... Statistically, if something is not covered, clearly is not covered, would there still be a need or a requirement to affirmatively disavow everything else or other steps? If something is clearly not covered by the label, it would seem that that wouldn't be necessary, but that's not the situation we have here, because I think the District Court correctly found that the use of defendants' products is, in fact, within the scope of the approval that defendants are seeking. It is an approved use of the product. And this Court's case law has said that the other remedy would be that once you realize that you are going to have a label that infringes the patent, you could not seek approval or wait until after the patent expires to launch the product. What you're basically saying is if you can get a new patent on a single use, you can bar them from selling the drug for uses that aren't covered by the patent. There's nothing they can do about it. Assuming that the FDA insists on including this material on the label, there's nothing they can do, right? I think that's what the statute contemplates, although I don't think... For example, it's often the case that method of use patents or other patents that cover a product are, in fact, narrower than the full scope of the indication. For example, the Sanofi v. Watson case has a broad cardiac indication, and the method of treatment that was infringed there was for patients who had that particular cardiac problem but also a specific set of risk factors. Those were not all of the treated patients. That's not that unusual. I'm not suggesting gamesmanship should occur, and there may be other arguments, in fact. It doesn't seem to be completely contrary to the purpose of the statute. The idea is that you should be able to have a hand allowing you to sell things for non-patented uses, and you're saying, no, no, you can't do that because you happen to encompass within the uses that people use it for something which is subject to another patent. I mean, that really seems perverse. I think that the way that one obtains a patent and then the way that one obtains FDA approval means that those two things don't always line up perfectly. Usually, patents are obtained actually before you get FDA approval, and oftentimes they may be narrower for various reasons than the ultimate indication that you get for a drug. If there is a situation, for example, where you can eliminate an indication or carve out the information fully from the label such that what remains on the label will not encourage the infringing use, then you can get yourself... You're saying that if the FDA doesn't permit that, there's nothing they can do. They're stuck. They can't sell it, even though they're selling it for legitimate purposes. I believe that is what is not only appropriate but called for by this Court's case law. If FDA requires the information to be in the label and it would nonetheless induce infringement of a valid patent, that would be infringement under the Hatch-Waxman Act. Can you say the intent requirement is satisfied just because they have knowledge that some physicians would prescribe it for the uses covered by your patent? Well, it's not simply the knowledge piece. It's the knowledge piece but then also proceeding to attempt to market the drug prior to the expiration of the patent nonetheless. For example, in Sanovian, the Court said that if the defendant there did not have intent required by the statute, then it would not seek and would not accept approval for a use that was claimed in the patent, and I think that is the case here. That's also echoed in AstraZeneca v. Apotex from 2010. I'm not clear what you're saying. Are you saying that the mere fact that they know that some doctors are going to prescribe it for the patented use is sufficient to show intent to induce? They know that the label will encourage at least some doctors to prescribe the drug for the claimed use. How does the label do that? The label does that here both because of the broad indication coupled most importantly with the information in Section 6.1 of the label that contains extensive data about treatment-emergent sexual dysfunction showing that it is quite low for vortioxetine and therefore doctors who are looking to treat a patient who has experienced sexually-related adverse events on another antidepressant would be encouraged to prescribe vortioxetine for that specific use, and there's ample testimony on that in the record. The data here is extensive. There's voluntarily reported adverse event data from seven pooled clinical studies. Those are the six- to eight-week MDD studies that are in Section 14 of the label, and those are thousands of patients. That's reflected in the data. Is this all data that the FDA required? There was some attempt by certain defendants, not all, to remove some of it from the label, and FDA said, no, we're requiring all of this. That makes sense because this was data that was originally. It seems like that's a problem. If the generic wants to market this for non-patent abuses and it submits a label that doesn't cover any of the patent abuses, it doesn't intend to market it for patent abuses, it doesn't intend to tell the doctors. We all know that doctors prescribe stuff off-label all the time. If the only thing that brings us within infringing these patents is data that the FDA requires, then why does that show intent by the generic to infringe? That is what this court's case law says. I understand what a case law says, but explain to me why that's correct. Because if you can't carve it out, that's the issue. If you can't carve it out, then one has to make a decision between going to market with data or information on the label that you know will encourage the infringing use, which I think certainly does show intent to induce infringement. But it's not their intent that's encouraging it. At best, it's the FDA's intent to signal to these doctors that they can prescribe it off-use. But you're not trying to go after the FDA, obviously. You're trying to go after the generic. To be clear, this is not an off-label use case. This use is on-label. This is not an instance where we're talking about the drug being prescribed for off-label uses or uses that are not approved in the label. But there's no evidence here that they were targeting the patented uses. I'm not sure. In terms of targeting, I think the issue is, will the label encourage doctors to prescribe the product for these specific uses? I believe it is. What in the label, apart from the information that FDA required, would induce infringement? I'm sorry, Judge Hughes, can you repeat that? Yeah, sorry, it was a little muddled. What in the label, apart from the parts that the FDA required, would encourage infringement? I'll point you to specific sections if you bear with me for one moment. So there's both the indication, which the court found covers the claimed use, and then there's the Section 6.1 data, which is the voluntary-related adverse event reporting, and then there's the... That was all required by the FDA. Because it's critical safety information. Of course it's going to be a part of the FDA. But that's not answering my question. Maybe my question makes no sense, and if it doesn't, tell me. But the FDA required certain information to be put on here. Take all of the information that the FDA required. Is there anything left that encourages infringement? The key information that encourages the infringement here is in 6.1. It's the safety data. There's also other labels, other portions of the label, for example. I just want to be comprehensive on that. In the opinion, so this is Appendix 150, Paragraph 604, the court pointed to some other portions of the label that also taught certain things to physicians. But the critical piece is 6.1, and I think as a practical matter here, this is the consequence of the way that the scheme works. For example, as I was mentioning before, let's take the Sanofi v. Watson case. Of course, the label, for example, might identify a critical patient population or information about a particular patient population that aligns with a claimed use or a claimed patent. In that instance, of course that information is going to be required. It's critical and it's important. It can still be infringed and there can still be intent to induce infringement. This is the way it works because FDA determines ultimately what's in the labels, and the generic companies must sometimes make a difficult decision about whether or not to move forward with attempting to market a product that has a patent covering that use. But it's the interaction between the FDA approval process, what's required for safety and effective use, and making sure that doctors have the right information, and the inducement case law, which that's how the statute contemplates that this will work. If there are no other questions, I think I'm in my rebuttal time, so I shall reserve. We're out of here. We're out of time. We have a few minutes. Let's see, who's going to go first here? Debranovitz? Good morning, Your Honors. May it please the Court, David Debranovitz. I'll be arguing on behalf of the defendant, Annalise, on the 096 and 910 method of use patents. I'd like to address three issues today. Plaintiff's infringement arguments under 271E2A, induced infringement, and contributory infringement. Since we spent most of our time with your colleague dealing with inducement, why don't you start with the inducement and the arguments you heard today being made. Defendants carved everything related to the 096 patent out of their labels. This is not a case where FDA actually rejected the card outs. Their Section 8 submissions carved out the clinical studies and the adverse event data associated with those clinical studies. They're arguing that you could have asked the FDA to allow you to carve out even more, and to leave out 6.1, right? Plaintiffs appear to be arguing that we could have done a larger carve-out. Defendants' carve-out actually mirrors the Trintellix label from before the clinical studies were done for the 096 and 910 patent, and from the Trintellix label as it was approved. I'd like to address the question of whether their premise is correct. Is there a possibility that the FDA would have allowed you to carve out the 6.1 data? No, Your Honor. We could not have carved out 6.1 data or changed the indication. As a generic, we have to apply the same indication. The only indication for which vortioxetine was approved, which is the treatment of patients with major depressive disorder, MDD with vortioxetine. Is it your view that 6.1 is enough to establish inducement or encouragement? 6.1 is not enough to establish inducement, as the district court found. 6.1 simply tells you the adverse events that you'd suffer if you took vortioxetine. The 096 patent requires three steps. First, the patient takes an antidepressant from one of four classes. Then that patient suffers TESD on that antidepressant, which has to be ceased to reduce. And third, the patient then takes vortioxetine for the treatment of MDD. Section 6.1 of the defendant's labels does not include any information about any product other than vortioxetine, only discusses TESD a patient would suffer while taking vortioxetine, not some other medication, and instructs physicians not to compare results for vortioxetine with other products explicitly, as the district court found. Defendants have engaged in no activity encouraging, recommending, or suggesting to a physician that the use of generic vortioxetine should be in concert with the method described in the 096 patent. In fact, the method described in the 096 patent may intersect with the approved use, which is treating vortioxetine with MDD, but as the district court found, it's a separate and different use that simply intersects with the approved indication. It is not the same. And was there expert testimony on both sides on that point, or what was the record? There was expert testimony on both sides, and the court had ample evidence, substantial evidence to find that the uses were different, and that physicians may prescribe vortioxetine in concert with the 096 patent based on the brand Trimtelex label, but not in concert with the generics carved-out label. I don't understand. What does that mean, in concert? So looking at the brand label, a physician might prescribe Trimtelex for a use that would be covered by the 096 patent, and eventually that prescription... And the district court found that they would have been aware of that, right? Defendants are aware of that, but under this court's case law, that's not enough. As far back as Warner-Lambert, simply knowing that an infringing use might occur is not enough to establish intent. That's especially true in a situation like this, which is similar to the Grunenthal and HC&P cases, where there is an approved indication, but the use in the patent is at best intersecting or a subset of the approved indication, and that particular use has been carved out of the label. So even though there is knowledge that the generic product might be used in an infringing manner, that's not enough to simply prove intent. There has to be more than that. Some suggestion, recommendation, or encouragement in the label to prescribe for that specific use in that manner. Here we don't have that. Would that be true, for example, if they knew that half the uses would be infringing? I think Warner-Lambert's actually really instructive on that. In the Warner-Lambert case, the approved indication for which the generics set was a minor use. You would call it a minor use because it was something like less than 5% of all prescriptions were for that use, and the generics knew that it would be prescribed for other uses. Let me answer my question. My question was, suppose it was 50% and they knew it was 50%? And I think that's where I was going, Your Honor. I think that in Warner-Lambert, they knew that those other uses were going to be. The defendant knew that it was a minor use there. No, the use they sought approval for was the minor use. They knew that the other 95% of uses would be prescribed for Neurontin, Galpetin, but this court found that even that knowledge, that only 5% of patients would actually be taking for the indication the generics sought of, wasn't enough under Section 8 because those labels, they're only seeking intent for those 5% of the patients, even if they know 95% of patients would be substituted for some of their use. I'd also just like to address for a second the contributory arguments that plaintiffs have made, and there is no statute or case law that a substantial amount of pharyngeal use can't be covered by some other patent. The statute's patent-specific. Does Warner-Lambert tell us that it doesn't make any difference that it's 95%? I do not recall whether that's in the appellate opinion or the district court opinion that the use is only 5%. But what Warner-Lambert tells us is it doesn't matter whether the use is small or not. If they've carved it out, the intent is for the indication for which the defendants are seeking approval, not for some other use that's not described in the label. I think Grunenthal might be particularly instructive on that, because in that case, the approved indication that the generics sought was chronic pain, and the patent was for neuropathic pain, which was a separate indication, which had been carved out. And plaintiffs clearly proved in that case that defendants were aware that a lot of the chronic pain prescriptions would be for neuropathic pain. But this court found that even though the generics were aware that many, if not a majority of those prescriptions would be for neuropathic pain, that the fact they carved out that from the label showed a lack of specific intent. Can I go back to inducement? It's my recollection that the other side represented to the FDA that the Section 6-1, as it existed in the original label, and as it exists in the carve-out and the label, would actually discourage prescription for TESD. Am I right about that? That is correct. The district court found that. In filing their citizen petition, plaintiffs told FDA that the Information 6.1, because of the rate of TSD on vortidoxine, might discourage prescribers from prescribing for that purpose. And in response to that, in the citizen petition decision, the FDA actually found that the carve-outs defendants had made not only got past the use code that was listed in the Orange Book, which is broader than the 096 patent, but also the 096 patent. The FDA found in a footnote that defendants' carve-outs were broad enough to meet that lack of intent for that particular use. Was there any evidence that the 6.1 data in the carve-out label was the cause of physicians' willingness to prescribe this for the patented use? There was conflicting expert testimony on that. The defendants' expert noted that the high rates of TESD and 6.1 would have discouraged prescribers, and that plaintiffs' own evidence demonstrated that physicians were not very familiar with the ASEX criteria used in 6.1, and such physicians wouldn't necessarily use that as a comparator with other products. I guess the question is, do we have a finding? Was that finding referenced by Judge Post just now? Do we have a finding by the district court that the label wouldn't cause these patented uses? Judge Stark specifically found that the carve-out label would not induce these specific uses because the eliminated material prohibits comparison with other products and encourages a physician not to prescribe. So that, if we look at Appendix 145-46, Paragraphs 585-89. 585-89. 585-89. That's not quite the finding that I was asking about. Maybe you should look at Appendix 226. I may be wrong about that, but that seems— You could also look at Appendix 147, Paragraphs 595 and Appendix 226-28, where the district court came to its legal conclusions apart from the factual findings. Well, 595 says that you might discourage prescribers. His legal conclusions are at 225-226. I think I'm over my time, and unless there are further questions, I seem to have— Thank you. Thank you. Thank you, Your Honors. Deepar Markerjee on behalf of Cross Appellant Blupin. Your Honors, I'm cognizant of the limited time I have, so I will try to be as brief as possible. The singular issue in this portion of the appeal deals with the district court's construction of the term reacting, as it appears in the— Your contention is that this compound has to be a starting material at an intermediate. That's basically your argument. That's correct, Your Honor. So if you look at the 626 patent, in every instance, whether we're talking about the claims, whether we're talking about the specification disclosures, and every single example as well, compounds 2, 3, and 4, which are seminal to the process, are always referred to as starting material or used as starting materials. And that goes through even in the prosecution history, because it's very limited. But in the one office action that was even issued, which I believe was a non-final one, the 2015 office action, the examiner always refers to compounds 2, 3, and 4 as starting compounds. It's never, anywhere in the intrinsic record, ever referred to as an in situ, intermediate-type compound or something that will just start in the process or somewhere in the process. But that's not a limit, is it? I don't believe that anything that I am trying to say is to limit something. It is just simply that, as used in the patent, the term reacting is always referring to the usage of compounds 2, 3, and 4 as the starting material. That's how the reaction can even take place, by always having those three compounds either in a one pot, like one chamber-type reaction, or in a two chamber reaction. It's always put in as starting material. It's never an intermediate. It's never midway into the process. It's always how it starts. In some ways, even, I think in one aspect, plaintiffs in some way kind of acknowledge that, too. I should say Lundback acknowledged that, because in the yellow brief, I believe even in page 14, Lundback calls when they characterize claims 2 and 3, they actually state that claims 2 and 3 specify the introduction of compounds 2, 3, and 4. In that way, whether we call it introduction or we call it starting material, it's always consistently the starting material that actually starts the reaction. And that's it, Judge Dyke. That is essentially the construction. It is not a far-fetched type construction. It's just in keeping with the actual teachings and all of the intrinsic record. In every instance, it's the starting material. And where I think I take some issue with the district court's ultimate adoption of the construction that Lundback proposed was simply that it was the usage of extrinsic evidence in the form of expert testimony and a dictionary definition not for reacting, but for the noun reaction to come up with the proffered construction of just a reaction being changing a reactant to products. But that broad a definition is just not supported anywhere in the intrinsic record. And the intrinsic record obviously is the first best place that we go to when we're trying to determine even a term like reacting, which everyone, I can concede that it's a fairly common term that is used, but its definition is context-dependent always. It's not like the straight path case that this court ruled on on the definition of is. Reaction may be known, or I'm sorry, reacting might be known, but it's always context-dependent. And here, Your Honor, to go back to your seminal question, reacting is always in reference to those compounds as starting compounds. And Lupin, of course, does not use compound 2 as its starting compound in its process. And so the adoption of Lundback's construction is what led to the infringement finding against Lupin. And as this court does de novo review of the construction, we submit that under the proper construction, there can't possibly be any finding of infringement. Okay. Are there any other questions? Thank you. All right. Thank you, Your Honor. Okay. So I gave you two minutes. We'll make that four since you have a time requirement across the two houses. Would Your Honors like me to address the 626 process patent and reacting? On that front, I will say I think the court did a textbook fill-up analysis, adopted the plain and ordinary meaning of the term because there was no basis to limit it by definition, disavowal, or disclaimer. And Lupin offers none here today or in its briefing. I think the court clearly got that right, as it did with respect to its determination on infringement of the 626 patent. So if there are no questions, I'll respond to some of Mr. Abramowitz's points and some of the questions you asked as well. There was a question regarding – I want to distinguish Werner Lambert and Grunenthal because in both of those cases, those were off-label uses where an entire indication and all of the relating data was carved out of the patent or the patent that was asserted in the case covered a use that was not an approved use or indication of the product. So I think those are wholly inapplicable to the situation that we have here.  described the use claimed in the 096 patent as an off-label use. The court actually expressly found that it is an approved use of defendants and of products and that the products will be used for the claimed use prescribed that way by physicians. I would point to paragraph 557 of the court's opinion, also where the court specifically found that defendants had not narrowed the indication that they were seeking. I think Judge Prost, you asked – I mean, this is pretty troublesome, isn't it? That you have a situation where there's a compound, an expired patent on the compound and the statute conflates that the generics under those circumstances ought to be able to file a canda and to market the product. And you're saying, no, no, that can't happen because we get a new patent on some sliver of the approved use. And because some people will prescribe for that purpose, then you can't sell the generic for the expired patent abuse. I mean, that doesn't seem right, does it? The patent law expressly contemplates, especially in the chemical arts. Expressly contemplates? Contemplates that people will – that patent applicants will do additional research on known or existing compounds, that they will be able to obtain methods. Well, how does that reflect in a contemplate that that additional research and the additional patents will prevent the sale of the product for the expired patent? Well, there, Section 271E2A says that it includes expressly patents that claim a product or a method of using the product and the remedy that it specifically prescribes for infringement of a method of use patent covering a product is that the FDA cannot approve the application until expiration of the patent. Actually, it is expressly in there that that is what's contemplated. And in this court, in Ila Lili Viteva and also in Lucent, has said there isn't a prevalence requirement for inducement. If there is at least some induced activity, if there is at least one act of infringement that is caused by the label, then you get the 271E4 remedy. And, therefore, I think it is actually expressly contemplated by the statutory scheme. I wanted to address Judge Prost's question about the issue of the citizen petition and the issue that was raised by Lundbeck with respect to concerns that removing the information from Section 14 from the label might lead doctors to misunderstand the Section 6.1 data that it could potentially cause them to misunderstand or think that the TESD rate was high. FDA rejected that. They said, no, doctors will fully understand this. They will contemplate that they will know how to placebo adjust. They will understand all of this data and the rates. And that was confirmed by the experts at trial. And on that issue, I think there was a question posed about whether there was expert testimony on both sides. And I disagree with the idea that there was in two specific instances. First of all, defendants' FDA expert never offered the opinion that this was an off-label use of any kind. And then, also, Dr. Rothschild, their physician expert, which is the only testimony that the court relied on in finding no induced infringement, did not in any way address the 5-, 10-, or 15-milligram doses of the product. His opinions were solely related to that. Thank you, Your Honor. Thank you. Now, I guess, McCurgey, there wasn't much mention of your cross-appeal. Do you have anything vital to say? No, thank you, Your Honor. I appreciate that. All I would just say is I heard my colleague on the other side say that the district court's analysis was a textbook Phillips analysis. I disagree. I think a textbook Phillips analysis would look at the intrinsic record and see how it uses compounds 2, 3, and 4 as part of this process. And there I just return to that simple fact. It is always the starting material. Okay, thank you. And there was no mention of the contingent cross-appeal, so we don't have any further argument on that. So the case is submitted. The cross-appeal in validity you're talking about, Your Honor, I'm sorry, or just on to the suggestion. Yeah, there was no mention of that. Right. Okay. The case is submitted. Thank you all.